UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| In Re: | Case No. 14-05945 |
| | Ch. 13 Proceeding |
| Thomas S. Meeker, | Hon. Scott W. Dales |
| | Filed: 09/11/2014 |
| Debtor. | |
| _____/ | |
| Thomas S. Meeker, | |
| Plaintiff, | Adv. Pro. |
| -v- | |
| Navient Solutions, Inc.; Loan Science, LLC; Turnstile Capital Management, LLC; National Collegiate Student loan Trust 2004-1; National Collegiate Student loan Trust 2005-1; National Collegiate Student loan Trust 2005-2; National Collegiate Student loan Trust 2006-1, | |
| Defendants. | |

COMPLAINT TO DETERMINE DISCHARGEABILITY OF STUDENT LOAN INDEBTEDNESS
PURSUANT TO 11 U.S.C. §523(a)(8)

**I.    JURISDICTION & VENUE**

1. This Court has jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. § 1334 (b) and 28 U.S.C. §§ 157(b) and 1332.

2. This is a core proceeding under Title 11 as it seeks a determination as to the dischargeability of a debt.

3. This adversary proceeding is brought pursuant to 11 U.S.C. § 523(a)(8) and Federal Rule of Bankruptcy Procedure 7001.

1

4. Venue is proper in the Western District of Michigan as this matter arises in and is related to a bankruptcy case in this district.

## II.    PARTIES

5. Plaintiff is the Debtor in the underlying bankruptcy matter. Plaintiff is a natural person residing in Kent County, Michigan.

6. Defendant Navient Solutions, Inc. (hereafter "Navient") is a Delaware Corporation that regularly conducts commercial activities in this district and can be served through its agent, CSC-Lawyers Incorporating Service, 601 Abbott Rd., East Lansing, MI 48823.

7. Defendant Loan Science, LLC (hereafter "Loan Science") is a Texas Corporation that regularly conducts commercial activities in this district and can be served through its agent, Incorp. Services Inc., 40600 Ann Arbor Rd. East, Ste. 200, Plymouth, MI 48170.

8. Defendant Turnstile Capital Management, LLC (hereafter "Turnstile") is a Delaware Corporation that regularly conducts commercial activities in this district and can be served through its agent, CSC-Lawyers Incorporating Service, 601 Abbott Rd., East Lansing, MI 48823.

9. National Collegiate Student Loan Trust 2004-1 is a Delaware Statutory Trust that regularly conducts commercial activities in this district and can be served through its agent, Wilmington Trust Company, 1100 N. Market St., Rodney Sq., Wilmington DE 19890.

10. National Collegiate Student Loan Trust 2005-1 is a Delaware Statutory Trust that regularly conducts commercial activities in this district and can be served through its agent, Wilmington Trust Company, 1100 N. Market St., Rodney Sq., Wilmington DE 19890.

11. National Collegiate Student Loan Trust 2005-2 is a Delaware Statutory Trust that regularly conducts commercial activities in this district and can be served through its agent, Wilmington Trust Company, 1100 N. Market St., Rodney Sq., Wilmington DE 19890.

12. National Collegiate Student Loan Trust 2006-1 is a Delaware Statutory Trust that regularly conducts commercial activities in this district and can be served through its agent, Wilmington Trust Company, 1100 N. Market St., Rodney Sq., Wilmington DE 19890.

### III.    LEGAL HISTORY

*11 U.S.C. 523(a)(8): A Solution in Search of a Problem*

13. Prior to 1976 a debtor could obtain a discharge of educational debt in bankruptcy without any qualifications.

14. In 1970 Congress established the Bankruptcy Act Commission (hereafter "the Commission") to help reform the Bankruptcy Act of 1898. When the Commission issued its findings in 1973 it contained restrictions on educational debt.

15. The restrictions were seen as necessary to prevent public outrage at allowing students to discharge their student loans, despite a report from the General Accounting Office which found that less than one percent of all federally insured and guaranteed student loans were discharged in bankruptcy.[1]

16. Instead of addressing an *actual* problem, the Commission's recommendation sought to preempt "*potential* abuses" and defaults that industry representatives of the student loan system anticipated would occur.[2]

17. During debate on the issue, two competing viewpoints emerged. The first of these viewpoints was espoused by Rep. James O'Hara who was the Chairman of the Subcommittee on Postsecondary Education, as well as the bill's primary sponsor. Rep. O'Hara argued that the bill "visits a special discrimination upon [students] … it treats educational loans precisely as the law now treats debts incurred by fraud, felony, and alimony-dodging. [It is a] slap in the face of every single student borrower … [i]t assumes that borrower's bad intentions…[3]

18. The opposing viewpoint was put forth by Representative Allen E. Ertel who stated that "At a time when political, business, and social morality are major issues, it is dangerous to enact a law that is almost specifically designed to encourage fraud." Ultimately Ertel's view carried the day and the Bankruptcy Code was amended to make the discharge of student loans more difficult.

---

[1] For a full account of these events and the evolution of the Bankruptcy Code's student loan discharge provision, *see generally* Rafael I. Pardo & Michelle R. Lacey, *Undue Hardship in the Bankruptcy Courts: An Empirical Assessment of the Discharge of Educational Debt*, 74 U. Cin. L. Rev. 405, 419-28 (2005).
[2] *See* H.R. Doc. 93-137, at 178 n.5; *see also id*., pt. 2 at 140 ¶14.
[3] *See*, H.R. Rep. No. 94-1232 (1976), *reprinted in* H.R. Rep. No. 95-595, at 147 (1977), *and in* 1978 U.S.C.C.A.N. 5963, 6108.

19. Though the record of the debate in Congress shows sharply divided views, and the scourge of fraud and abuse was more fantasy than reality, Courts have regularly looked to the Commission's recommendations to find support for curtailing bankruptcy relief available to debtors.[4]

20. After 1978 Congress continued to limit a debtor's once unfettered right to discharge their student loans through the further amendments of the Bankruptcy Code (hereafter "the Code"

21. Under the 1978 amendments, a chapter 7 debtor was unable to discharge their student loans for a period of five years after they came due unless they were able to show that repayment of the loans would pose an undue hardship. After the five year period, a debtor's right to discharge student loans was unfettered.

22. Under the 1978 amendments § 523(a)(8) did not apply to chapter 13 cases. Thus, a debtor's right to discharge student loans in a chapter 13 case was absolute and not subject to any waiting period, or a showing of undue hardship.

23. In 1990 the Code was amended to increase the waiting period to discharge student loans from five to seven years. Notably, these amendments also made the waiting period as well as a showing of undue hardship applicable to chapter 13 cases as well as chapter 7.

24. In 1998 the Code was amended yet again when legislation did away with the fixed waiting period option for dischargeability.

25. The amendments of 1978, 1990, and 1998 all but eliminated a debtor's right to discharge student loans.

26. With the passage of the 2005 Bankruptcy Abuse Prevention and Consumer Protection Act (hereafter "BAPCPA"), private lenders and debt collectors won *__limited__* protection in bankruptcy for *__some__* of their products. Specifically, in order to protect the integrity of the

---

[4] *See, e.g.*, Educ. Credit Mgmt. Corp. v. Polleys, 356 F.3d 1302, 1306 (10th Cir. 2004) (observing that statutory provisions designed by the Committee were "designed to remove the temptation of recent graduates to use the bankruptcy system as a low-cost method of unencumbering future earnings"); Cazenovia College v. Renshaw (In re Renshaw), 222 F.3d 82, 87 (2d Cir. 2000) (noting that the Committee's heightened undue hardship recommendations were supported by "increasing abuse of the bankruptcy process that threatened the viability of educational loan programs"); United Student Aid Funds, Inc. (In re Pena), 155 F.3d 1108, 1111 (9th Cir. 1998) (noting congressional intent that ordinary hardship, as opposed to undue hardship, should not facilitate a discharge of student loans).

student loan system, Congress limited this protection for private loans to the extent that such money supplemented and mirrored federal student lending.[5]

27. Private lenders took full advantage of their newly granted protections and embarked on an aggressive campaign of lobbying in order to increase profits.

28. A leaked document outlining the lobbying strategy of Defendant Navient (formerly Sallie Mae) describes it in terms that sound more suitable for the invasion of a small Central American nation. The policy called for "substantial penetration of 'first tier' congressional offices for initial contacts," hiring a Democratic lobbyist, and "arm[ing] Congressional Republicans and [the] Administration to combat irresponsible proposals."[6]

29. Between 2005 and 2007 lenders increasingly marketed and disbursed loans directly to students, thereby cutting the school financial aid office out of the process. During this period the percentage of loans without school involvement or certification of need grew from 18% to over 31%. As a result, many students borrowed more than they needed to finance their education.[7]

30. The main reason for the increased amount of private loans is their absurd profitability. Originators sell the loans with the intention of packaging them for investors in what are known as SLABS (Student Loan Asset Backed Securities). High investor demand for SLABS allowed issuers to create structures where $100 in student loans could generate _*immediate*_ cash proceeds from securitization of $105 or more.[8]

31. Fueled by investor demand for SLABS, the private student loan market grew from less than $5 billion in 2001 to over $20 billion in 2008.

---

[5] Unfortunately there is very scant legislative history regarding the enactment of the provisions in BAPCPA regarding the addition of private lenders. However, it is important to note that Salle Mae (now Navient) alone spent nine million dollars lobbying Congress when the bill was under consideration, and donated $130,000 in campaign contributions to members of the key committees considering the legislation. See Benjamin Miller and Stephen Burd, *"Sallie Mae's Plan of Attack,"* New America Foundation, July 10, 2007.
[6] Rafael Pardo and Michelle Lacy, "*The Real Student Loan Scandal: Undue Hardship Discharge Litigation*," American Bankruptcy Law Journal, p.180.
[7] Consumer Financial Protection Bureau (2012). *Private Student Loans: Report to the Senate Committee on Banking, Housing, and Urban Affairs, the Senate Committee on Health, Education, Labor, and Pensions, the House of Representatives Committee of Financial Services, and the House of Representatives Education and the Workforce.*
[8] *Id*.

32. During the lending boom, private lenders sought to increase the volume of new loans by through a new marketing channel and processing protocol – Direct -to-Consumer ("DTC") lending.

33. DTC circumvented the school's financial aid office, marketing instead through mass media, online advertising, and direct media. Funds were disbursed directly to students instead of the school and schools did not certify the borrower's need.[9]

34. By cutting the financial aid office out of the process, private lenders removed an integral part of the student aid system whose sole purpose is to encourage responsible lending and borrowing.

35. Private lenders were aware that by cutting the financial aid office out of the process through DTC lending, it was likely that students would not use the funds as intended, as the lenders made clear to investors in the prospectuses issued with the SLABS:

Private credit student loans made for qualified education expenses are generally not dischargeable by a borrower in bankruptcy. … In addition, direct-to-consumer loans are disbursed directly to the borrowers …[t]his process does not involve school certification as an additional control and, therefore, may be subject to some additional risk that the loans are not used for qualified education expenses.[10]

36. The boom years of 2005-2007 came screeching to a halt when widespread fraud, graft, and bribery in the private student loan market was exposed. The fallout included the departure of financial aid directors from storied institutions such as Columbia University, Johns Hopkins University, and the University of Texas at Austin. The chief operating officer of the Office of Federal Student Aid at the Education Department resigned her post amidst public criticism over the Department's failure to police the student-loan system effectively. Top executives at Student Loan Xpress, a company whose payoffs to college officials made it the poster child for the scandal, were suspended.[11]

*****

37. Congress' special treatment of educational is rooted in unfair stereotypes and supported with anecdotal evidence rather than empirical data. As Rep. O'Hara presciently warned, an honest but unfortunate debtor who attempts to discharge student loan debt is slapped

---

[9] *Id.*
[10] *See*, SLM Student Loan Trust 2008-9 Prospectus Supplement to Base Prospectus dated June 25, 2008 at 33.
[11] Rafael Pardo and Michelle Lacy, "*The Real Student Loan Scandal: Undue Hardship Discharge Litigation*," American Bankruptcy Law Journal, p.180.

6

in the face and lumped in with those who commit fraud, dodge child support, or kill someone in a drunk driving accident.

38. This special treatment has evolved into two justifications for the non-dischargeability of student loans: (1) preserving the financial solvency of the student aid system and (2) preventing abuse of the bankruptcy system.

39. While protecting the solvency of the student aid system is important, this justification falls apart when applied to private lenders. The bankruptcy protections extended to private educational lenders in 2005 cannot be justified in terms of conserving governmental resources. It is nothing more than a bare preference one segment of private loans over another. [12]

40. Congress' treatment of student loans has failed to protect the integrity of the bankruptcy system. The BAPCPA amendments led directly to the orgiastic excess of private student lenders, and denied the honest but unfortunate debtor the fresh start he or she is entitled to. To paraphrase Rep. Ertel, at a time when political, business, and social morality are major issues, it is dangerous to uphold a law that is almost specifically designed to encourage fraud.

IV. **FACTUAL HISTORY**

41. Plaintiff has struggled with Attention Deficit Hyperactivity Disorder, as well as Obsessive Compulsive disorder from a young age. These conditions have always made academic pursuits a struggle for him.

42. In Spring of 2002 Plaintiff enrolled at Portland State University (hereafter "PSU") with the intention of obtaining a degree in Architecture.

43. Plaintiff's academic performance at PSU was greatly affected by his learning disabilities. While enrolled at PSU Plaintiff's cumulative GPA was 1.90, and though enrolled in thirty-one courses, Plaintiff only obtained a passing grade in 15 of them.

44. In the fall of 2002, Plaintiff became ineligible to receive federal student aid due to his poor academic performance and was placed on a financial aid suspension by PSU.

---

[12] *See Doyle v. Creeger (In re Creeger)*, Nos. 14-34053, 15-3023, 2016 WL 3049972, at *9 (Bankr. N.D. Ohio May 20, 2016).

7

45. In 2005, Plaintiff left PSU and enrolled in the School of Art Institute of Chicago (hereafter "SAIC").

46. While enrolled in SAIC, Plaintiff struggled academically due to his learning disabilities. Plaintiff's cumulative GPA at SAIC was 1.00, and though enrolled in forty-seven courses, Plaintiff only obtained a passing grade in twenty of them.

47. On at least three separate occasions SAIC attempted to revoke Plaintiff's admission status due to poor academic performance.

48. In 2009 Plaintiff left SAIC without obtaining a degree.

49. In order to finance his education, Plaintiff obtained several federally guaranteed student loans totaling $119,536. The current balance of these loans is approximately $95,506.

50. In addition to his federal student loans, Plaintiff borrowed a total of $184,200.57 in a total of twenty private student loans. The outstanding balance on the loans is now approximately $364,867.16. A list of the Plaintiff's private loans is attached as **Exhibit A**.

51. No less than fourteen of Plaintiff's loans were DTC loans which were made without involvement of any financial aid office.

52. None of the loans at issue in this matter were certified by any financial aid office.

V. **GOVERNING LAW**

53. Section 523(a)(8) excepts three distinct types of educational debts from discharge unless the debtor can show by a preponderance of the evidence that repayment of the debt would constitute an undie hardship. Specifically, these types are as follows:

    a. an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution 11 U.S.C. §523(a)(8)(A)(i);

    b. an obligation to repay funds received as an educational benefit, scholarship, or stipend 11 U.S.C. §523(a)(8)(A)(ii); or

8

    c. any other educational loan that is a qualified education loan, as defined in section 221(d)(1) of the Internal Revenue Code of 1986, incurred by a debtor who is an individual 11 U.S.C. §523(a)(8)(B).

54. Defendants each bear the initial burden of proof in this matter as it "remains on the creditor to show its debt is excepted from discharge under Section 523." *Grogan v. Garner*, 498 U.S. 279 (1991). Thus it is up to Defendants to prove by a preponderance of the evidence that a debt exists, and that the debt is the type excepted from discharge under §523(a)(8).

55. Should Defendants satisfy their burden of proof, then and only then, does the burden shift to Plaintiff to prove by a preponderance of the evidence that repayment of the debts would constitute an undue hardship. *See Brown v. Rust*, 510 B.R. 562, 567 (Bankr. E.D. Ky. 2014).

*The Loans at Issue in this matter do not fit within the exception to discharge found in 11 U.S.C. §523(a)(8)(A)(i)*

56. Loans NV-1, NV-2, NV-3, NV-4, NV-5, NV-6, NV-7, NV-8, NV-9, NV-10, NV-11, NV-12 and NV-13 are not educational benefit overpayments or loans made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution.

57. Loan LS-1 is not educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution.

58. Loans TC-1 and TC-2 are not educational benefit overpayments or loans made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution.

59. Loans NCT-1, NCT-2, NCT-3, and NCT-4 are not educational benefit overpayments or loans made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution.

*The Loans at Issue in this matter do not fit within the exception to discharge found in 11 U.S.C. §523(a)(8)(A)(ii)*

60. In 1990, as part of the Crime Control Act of 1990, Congress amended §523(a)(8) to include subsection (A)(ii). This subsection makes non-dischargeable "an obligation to repay funds received as an educational benefit, scholarship, or stipend."

61. Section 523(a)(8)(A)(ii) was added by Congress in order to "add to the list of non-dischargeable debts, obligations to repay educational funds received in the form of benefits (such as VA benefits), scholarships (such as medical service corps scholarships) and stipends." *Federal Debt Collection Procedures of 1990:* Hearing on P.L. 101-647 before the H. Subcomm. On Econ. And Commercial Law, H. Judiciary Committee 101st Cong. 74-75 (June 14, 1990) (Mr. Brooks' Questions for the Record for Mr. Wortham).

62. Section 523(a)(8)(A)(ii) is "not a 'catch-all' provision designed to encompass any educational claim arising out of any transaction that bestows an educational benefit on a debtor." *DeWine v. Dudley*, 582 B.R. 708 (Bankr. S.D. Ohio 2017).

63. Loans NV-1, NV-2, NV-3, NV-4, NV-5, NV-6, NV-7, NV-8, NV-9, NV-10, NV-11, NV-12 and NV-13 are not obligations to repay funds received as an educational benefit, scholarship, or stipend.

64. Loan LS-1 is not an obligation to repay funds received as an educational benefit, scholarship, or stipend.

65. Loans TC-1 and TC-2 are not obligations to repay funds received as an educational benefit, scholarship, or stipend.

66. Loans NCT-1, NCT-2, NCT-3, and NCT-4 are not obligations to repay funds received as an educational benefit, scholarship, or stipend.

*The Loans at Issue in this matter do not fit within the exception to discharge found in 11 U.S.C. §523(a)(8)(B)*

67. In order to protect the integrity of the student aid system, and prevent irresponsible lending and borrowing, The 2005 BAPCPA Amendments granted protection to "Qualified Education Loans" (hereafter "QEL") to the extent that such loans supplemented and mirrored federal student lending: money lent to eligible students at Title IV accredited schools for tuition, room, board, and books.

68. Whether or not a loan is a QEL requires a byzantine journey through the Internal Revenue Code, the Higher Education Act of 1965, the American Opportunity and Lifetime Learning Credits, and the regulations interpreting them all.

69. In order for an educational loan to be a "qualified education loan" as defined in 26 U.S.C. §221(d)(1), all of the following requirements must be satisfied:
    a. The loan must be incurred solely to pay qualified higher education expenses.
    b. The expenses must be incurred by the taxpayer.

10

    c. The expenses paid for must be attributable to a specific academic period.
    d. The expenses must be paid or incurred within a reasonable period of time before or after the loan is incurred.

70. Plaintiff concedes that the expenses in question were incurred by him, and that he was a taxpayer at the relevant times.

71. The remaining three requirements are discussed more thoroughly below.

*** *Qualified Higher Education Expenses* ***

72. In order for a loan to be a QEL it must be incurred solely to pay Qualified Higher Education Expenses.

73. Section 221(d)(2) defines Qualified Higher Education Expenses as "[T]he cost of attendance as defined in section 472 of the Higher Education Act of 1965…"

74. Section 472 of the Higher Education Act of 1965 defines the "cost of attendance" (hereafter "COA") as tuition and fees normally assessed a student carrying the same academic workload as the student, an allowance for room and board, and an allowance for books, supplies, transportation, and miscellaneous expenses of the student. *See* 20 USC 1087ll.

75. A student's COA is determined by the academic institution they are attending. *26 C.F.R. 1.221-1(e)(2).*

76. Upon information and belief, Plaintiff's COA for the years 2005-2009 are listed below.

| Year | COA | Total Private Loans Disbursed | Amt. over COA |
|------|-----|-------------------------------|---------------|
| 2004 | $5,121.00 | $10,363.57 | $5,242.57 |
| 2005 | $27,150.00 | $29,378.00 | $2,228.00 |
| 2006 | $29,220.00 | $39,859.00 | $10,639.00 |
| 2007 | $31,040.00 | $52,417.00 | $21,377.00 |
| 2008 | $32,840.00 | $45,183.00 | $12,343.00 |
| 2009 | $34,600.00 | $7,000.00 | $0.00 |

11

77. As seen above, Defendants loans exceeded Plaintiff's COA in almost every instance.

***Academic Period***

78. In order for a loan to be a QEL the expenses must relate to a specific academic period. *See 26 C.F.R. 1-221(e)(3)(B).*

79. The term "academic period" is defined as "a quarter, semester, trimester, or other period of study as reasonably determined by an eligible educational institution. …" *26 C.F.R. 1.225A-2(c).*

80. **Exhibit A** lists the Academic Periods that Defendants claim are attributable to Plaintiff's loans. This information was taken from portions of Plaintiff's loan applications which were completed by the lender.

81. Neither PSU nor SAIC had academic periods which correlate with the periods on the loan applications, accordingly, the loans in question did not relate to a specific academic period.

82. In addition to educational expenses, the loans were used to pay everyday living expenses not only for academic periods, but for living expenses which were incurred during times when classes were not in session, thus the expenses were not attributable to a specific academic period.

***Reasonable Period of Time***

83. In order for a loan to be a QEL the expenses must be "[p]aid or incurred within a reasonable period of time before or after the taxpayer incurs the indebtedness." *26 C.F.R. 1.221-1(e)(3)(B).*

84. What constitutes a reasonable period of time "…is determined based on all the relevant facts and circumstances. However … expenses are treated as paid or incurred within a reasonable period of time before or after the indebtedness if:

    a. The expenses relate to a specific academic period; **and**
    b. the loan proceed used to pay the expenses are disbursed within a period that begins 90 days prior to the start of that academic period and ends 90 days after the end of that academic period. *26 C.F.R. 1.221-1(e)(3)(C)(ii).*

85. As discussed above, Defendant's loans did not relate to a specific academic period, and the expenses which they paid were not all incurred for expenses attributable to a specific academic period. Therefore, the expenses were not paid or incurred within a reasonable period of time before or after Plaintiff incurred the indebtedness.

*** *Eligible Student* ***

86. In order for a loan to be a QEL, the borrower must have been an eligible student when the loan was incurred.

87. The Higher Education Act states that in order to be eligible to receive student loans a borrower who is already enrolled at an eligible institution must "be maintaining satisfactory progress in the course of study the student is pursuing in accordance with the provisions of subsection (c);(q)." *20 U.S.C. 1091(a)(2)*.

88. A student is maintaining satisfactory progress if-
    (A) the institution at which the student is in attendance, reviews the progress of the student at the end of each academic year, or its equivalent, as determined by the institution, and
    (B) The student has a cumulative C average, or its equivalent or academic standing consistent with the requirements for graduation, as determined by the institution, at the end of the second such academic year.

89. Plaintiff was ineligible to receive student loans during all times applicable to the loans in question due to not maintaining satisfactory progress.

****

90. For the following reasons Loans NV-1, NV-2, NV-3, NV-4, NV-5, NV-6, NV-7, NV-8, NV-9, NV-10, NV-11, NV-12 and NV-13 are not qualified education loans:
    a. They were made in excess of Plaintiff's COA, and therefore were not used for qualified higher education expenses;
    b. They paid for expenses that were not attributable to a specific academic period;
    c. They paid expenses that were not paid or incurred within a reasonable period of time after disbursement of the proceeds.
    d. Plaintiff was not an eligible student at the time the loans were made;

91. For the following reasons, Loan LS-1 is not a qualified education loan:
    a. It was made in excess of Plaintiff's COA, and therefore weas not used for qualified higher education expenses;
    b. It paid for expenses that were not attributable to a specific academic period;

13

    c. It paid expenses that were not paid or incurred within a reasonable period of time after disbursement of the proceeds.

    d. Plaintiff was not an eligible student at the time the loan was made;

92. For the following reasons, Loans TS-1 and TS-2 are not qualified education loans:
    a. They were made in excess of Plaintiff's COA, and therefore were not used for qualified higher education expenses;
    b. They paid for expenses that were not attributable to a specific academic period;
    c. They paid expenses that were not paid or incurred within a reasonable period of time after disbursement of the proceeds.
    d. Plaintiff was not an eligible student at the time the loans were made;

93. For the following reasons, Loans NCT-1, NCT-2, NCT-3, and NCT-4 are not qualified education loans:
    a. They were made in excess of Plaintiff's COA, and therefore were not used for qualified higher education expenses;
    b. They paid for expenses that were not attributable to a specific academic period;
    c. They paid expenses that were not paid or incurred within a reasonable period of time after disbursement of the proceeds.
    d. Plaintiff was not an eligible student at the time the loans were made;

## VI. FACTUAL HISTORY CONTINUED

94. At that time Plaintiff returned home, moved in with his parents, and attempted to obtain a job in his chosen field of study. At that time Plaintiff had little to no income and relied heavily upon his parents for support.

95. In November of 2011 Plaintiff's sister, her husband, and her two young children were involved in a horrific automobile accident. Plaintiff's sister suffered a Traumatic Brain Injury, and his brother-in-law was killed in the accident, mercifully, the children (aged 6 and 2) were not seriously harmed.

96. Plaintiff immediately uprooted his life in Michigan and relocated to Georgia so that he could care for his sister and her children.

97. Plaintiff's sister was hospitalized for several months, and had to re-learn even basic tasks such speaking, walking, eating, bathing, dressing etc. Plaintiff assumed the role of primary caretaker and spent the next three years ferrying his sister and her children to school, day care, physical therapy, doctors appointments etc. In addition, Plaintiff was

solely responsible for cooking, cleaning, grocery shopping, and almost every other facet of his family's life.

98. Plaintiff's duties as a caretaker monopolized almost all of his time such that he was unable to obtain a job outside of the home.

99. Plaintiff did attempt to obtain freelance work whenever he could but was unable to develop a sustainable client base.

100. In 2014 Plaintiff returned to Michigan and obtained a job in his chosen field which paid approximately $37,800.00 per year.

101. Despite having obtained a job, Plaintiff did not earn enough income to be able to make even the minimum payments on his student loans.

102. On September 11, 2014, Plaintiff filed an order for relief under Chapter 13 of the United States Bankruptcy Code (Case No. 14-05945).

103. The loans at issue in this complaint were properly scheduled on Plaintiff's schedule F as general unsecured loans.

104. None of Defendants in this matter filed any objection to Plaintiff's proposed plan of re-organization.

105. The Plaintiff's Plan of Reorganization proposed to commit all of his disposable income for a period of no less than three years, and was confirmed by Order of this Court on November 19, 2014.

106. Plaintiff completed his Chapter 13 Plan on April 17, 2019 and received his discharge on May 22, 2019.

107. During his bankruptcy, Plaintiff continued to struggle with severe depression, feelings of worthlessness, and substance abuse. Whenever Plaintiff thought about the insurmountable amount of student loan debt he owed it would cause him to spiral and often trigger manic episodes. Plaintiff's description of these episodes is reproduced below:

> "I retreat from life, I don't leave the bed for days. I sleep, order delivery food, sleep, use the bathroom, sleep, don't shower, don't take care of personal hygiene, don't answer my phone or engage with others including my wife. This goes on for days at a time. When I do get up, I will do the bare minimum to get through the day. Respond to emails, join a Zoom call,

and then retreat back to bed. Nothing brings me joy and I feel like there is no purpose to life. I feel like I am more of a burden to others and don't have a strong will to live."

108. After the bankruptcy was completed, Plaintiff and his family members once again began receiving threatening calls from creditors multiple times per day. Plaintiff attempted to speak with the creditors to set up payment plans that he could afford, but they were unwilling to accept an amount that he could pay.

109. The sheer number of loans, the ever changing line-up of collection agencies, the ever compounding interest, and the ever present harassing calls sent Plaintiff into a deep depression as he came to the realization that his debt load was so great that he would never be able to repay it.

110. In spring of 2019, Plaintiff suffered a panic attack while on a flight while trying to think up a way out of his indentured servitude. Once the flight landed, Plaintiff called his wife and parents and told them that he intended to commit suicide by jumping off the roof of his hotel. His parents contacted airport security so that they could intervene but it was without success. Fortunately, Plaintiff's parents were able to have a close friend contact him and talk him out of taking his own life.

111. After his suicide attempt, Plaintiff began receiving mental health treatment at Pine Rest Christian Mental Health Services. During this treatment Plaintiff was diagnosed with Bipolar II Disorder. Currently, Plaintiff's treatment has reduced suicidal ideations, but still wrestles with depression and feelings of worthlessness and guilt.

## VII. REPAYMENT OF THE LOANS WOULD CONSTITUTE AN UNDUE HARDSHIP UPON THE PLAINTIFF

112. The *Brunner* test is used to determine the dischargeability of student loans, specifically, whether or not repayment of such loans would constitute an undue hardship upon the debtor. In order to pass the *Brunner* test a debtor must show:

   a. He or She cannot maintain, based on current income and expenses, a "minimal" standard of living for the debtor and the debtor's dependents if forced to repay the student loans;

   b. Additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and

      c. The debtor has made good faith efforts to repay the loans.[13]

### *The First Prong: The Debtor's Income and Expenses*

113. The three part *Brunner* test begins by reviewing the debtor's current financial condition by examining the debtor's circumstances at the time of trial. *See United Student Aid Funds v. Pena*, 155 F.3d 1108 (9th Cir. 1998).

114. The analysis of current income and expenses must consider whether the debtor can maintain a decent standard of living *after* making the full current monthly payment required to amortize the loan. *See In re Fecek*, 2014 WL 1329414 (Bankr. S.D. Ind. Mar. 31, 2014).

115. Attached as **Exhibit B** is snapshot of Plaintiff's household finances at the present.

116. As can be seen from Exhibit B, even without factoring in payments on the loans in question, Plaintiff is negative each month by more than $800.00.

117. Because Plaintiff cannot make the full current monthly payments necessary to amortize the loans and maintain a decent standard of living, he has satisfied the first prong of the *Brunner* test.

### *The Second Prong: Additional Circumstances Indicate that the Current Hardship is Likely to Continue*

118. Under the second prong, the court evaluates any "additional circumstances" that make it more likely than not that the debtor's current state of affairs will continue for the remainder of the loan's repayment term.

119. When attempting to define what a debtor must show in order to pass the second prong, the Sixth Circuit in *Oyler* require the debtor to establish the "certainty of hopelessness" or extraordinary or "exceptional" circumstances beyond the current inability to pay. *Id.* at 386.

120. According to *Oyler* facts indicating a "certainty of hopelessness" "may include illness, disability, a lack of usable job skills, or the existence of a large number of dependents. [M]ost importantly, the circumstances must be beyond the debtor's control, not borne of free choice. *Id*.

---

[13] *Oyler v. Educ. Credit Mgmt. Corp.*, 397 F.3d 382 (6th Cir. 2005) (*quoting Brunner v. New York State Higher Education Svcs. Corp.*, 831 F.2d 395 (2nd Cir. 1987)).

121. Plaintiff's long-running battle with ADHD, OCD, Depression, and BiPolar 2 Disorder is beyond his control and not borne of his own free choice. Plaintiff's maladies are serious psychiatric illnesses which accepted by the medical community as serious, incurable, and long-term. These troubles are certainly not borne of Plaintiff's own free choice. Therefore, Plaintiff without doubt passes the second prong of the *Brunner* test.

### *The Third Prong: Good Faith*

122. The third prong of the *Brunner* test requires that the debtor show a good faith attempt to repay the loans.

123. In order to satisfy the "good faith" test, it is not essential that the debtor have actually made any payments. Debtors who clearly lacked sufficient income to make minimal payments may still qualify for a discharge. *See In re Grove*, 323 B.R. 216, 225 (Bankr. N.D. Ohio 2005).

124. This test considers whether the debtor made efforts to obtain employment, maximize income, and minimize expenses in the past. *Headland v. Educational Res. Trust*, 718 F.3d 848, 852 (9th Cir. 2013).

125. Plaintiff has made good faith attempts to repay his student loans, but due to the staggeringly high payment, and his inability to secure employment with sufficient income to repay the loans and maintain a basic standard of living, he has been unable to make all required payments under the loans.

126. Plaintiff's Chapter 13 Plan of reorganization was proposed as a good faith effort to repay all of his creditors.

127. All of Plaintiff's creditors received notice of his Plan, all had the opportunity to object to the Plan if it was not proposed in good faith, but none of them did. Accordingly, Plaintiff's creditors agree that he has made good faith efforts to repay his loans.

128. Furthermore, neither the Chapter 13 Trustee nor this Court objected to Plaintiff's Plan or in any way indicated it was not proposed in good faith.

129. On November 20, 2014 this Court entered an Order Confirming the Plaintiff's Chapter 13 Plan and stated that the plan complied with all requirements for confirmation, including that a plan must be proposed in good faith pursuant to 11 USC 1325(a)(3).

130. Defendant has sought to maximize his income when possible. Most notable, he more than doubled his income during his chapter 13 plan.

131. In order to reduce household expenses, Plaintiff and his wife have postponed starting a family as they feel they are unable to afford the expense of children.

132. Because Plaintiff has made payments to the Defendants, the Defendants agreed that his repayment plan was proposed in good faith, and he has sought to maximize his income and minimize expenses, he has passed the third prong of the *Brunner* test.

**VIII.   CAUSES OF ACTION**

133. Plaintiff requests declaratory judgment pursuant to 28 U.S.C. 2201 and Federal Rule of Bankruptcy Procedure 7001(9) that Loans NV-1, NV-2, NV-3, NV-4, NV-5, NV-6, NV-7, NV-8, NV-9, NV-10, NV-11, NV-12, NV-13, LS-1, TS-1, TS-2, NCT-1, NCT-2, NCT-3, and NCT-4 are neither non-dischargeable student loans, nor qualified education loans, and were therefore discharged by order of this Court on May 22, 2019.

134. In the alternative, Plaintiff requests declaratory judgment pursuant to 28 U.S.C. 2201 and Federal Rule of Bankruptcy Procedure 7001(9) that repayment of loans NV-1, NV-2, NV-3, NV-4, NV-5, NV-6, NV-7, NV-8, NV-9, NV-10, NV-11, NV-12, NV-13, LS-1, TS-1, TS-2, NCT-1, NCT-2, NCT-3, and NCT-4 would constitute an undue hardship upon the debtor.

WHEREFORE, Plaintiff humbly requests that this Court grant him the declaratory relief sought, and award all other relief as is just and equitable under the circumstances.

Dated:  4/29/2021             __/s/_____
                              Jeffrey D. Mapes (P70509)
                              Attorney for Plaintiff
                              Jeffrey D. Mapes, PLC
                              29 Pearl St. NW, Ste. 305
                              Grand Rapids, MI 49503
                              Tel: (616) 719-3947
                              Email: jeff@mapesdebt.com